h COOKS, Judge.
This action was brought by the surviving family members of Daniel Ross and Clarence Landon against multiple defendants. The defendants are the employers of Ross and Landon (“the employer defendants”) and those whom the plaintiffs allege conspired with the employer defendants to cause Ross’s and Landon’s injuries (“the non-employer defendants”).
Factual and Procedural Background
Two suits were originally filed — one by the surviving family members of Ross and the other by the surviving family members of Landon — in April of 1997. The cases were consolidated in 1999 and styled as it now appears. Ross and Landon were employed by Conoco Chemical and its affiliates E.I. du pont de Nemours & Company and Vista Chemical Company. Plaintiffs complained they were injured as a result of Ross’s and Landon’s work place exposure to vinyl chloride because the employer defendants failed to inform Ross and Landon of the hazardous effects of the substance. Plaintiffs further alleged “[t]he exposure ... was a substantial contributing cause of the injuries, disease, [and] death of’ Ross and Landon. In addition to compensatory damages, plaintiffs also sought punitive damages relying on article *356 2815.3 from the employer defendants alleging they “engaged in the wanton and reckless disregard for public safety in the handling of hazardous materials.”
In later amendments and supplemental petitions, plaintiffs also alleged “the employers conspired with other members of the vinyl chloride industry to withhold vinyl chloride health effects from the government, the public, and workers.” As a result of the alleged conspiracy, they assert Ross and Landon were victims of an intentional tort culminating in a battery on their persons. They then added several | ^non-employer defendants in their fourth amending and supplemental[1] petition, specifically asserting the non-employer defendants (manufacturers and users of the chemical) “conspired” — through trade associations and other means with the employer defendants' — to keep the government and public from knowing the hazardous health effects of vinyl chloride, particularly the substance’s carcinogenic nature. Among other activities, they point to these defendants’ actual signatures on “secrecy documents” relating to the cancer causing effect of human exposure to the substance.
Plaintiffs also named Minnesota Mining and Manufacturing (3M) as a defendant claiming it manufactured badges used at the Conoco/Vista facility which it knew inaccurately registered the level of exposure to the chemical and it was a member of the trade association “through which the conspiratorial conduct took place.”
Plaintiffs argued the non-employer defendants should not be treated differently in the eyes of the law than the employer defendants with whom they conspired. They should, plaintiffs asserted, be deemed to have “stored, handled, or transported” the chemical — the acts of one conspirator ought to be imputed to the others. As further grounds to hold the non-employer defendants liable for punitive damages plaintiff pointed to the specific acts the non-employer defendants independently took in furtherance of the conspiracy which they alleged furthered the improper “handling, storage, and transportation” of the chemical. Among other acts, they alleged these defendants “provid[ed] inadequate warnings ... [and] promoted] ... fraudulent science, all designed to decrease awareness of the health hazards of vinyl chloride.” Warnings and safety information, plaintiffs maintained, are integrally related to the handling, storage, and transportation of vinyl chloride.
laAIl the non-employer chemical defendants named in the original, amending, and supplemental suits filed by Ross and Landon settled or have otherwise been dismissed from the consolidated action, except: Tenneco Oil Company, Shell Oil Company, BF Goodrich Company, The Society of the Plastics Industry, 3M, and Chevron U.S.A. Inc., as the successor of Gulf Oil Corporation.
The remaining non-employer defendants brought motions for partial summary judgment seeking to dismiss plaintiffs’ claim against them for punitive damages. They argued no punitive damages are recoverable for their alleged conduct because they were not themselves physically involved in the “storing, handling, or transportation” of the vinyl chloride which caused Ross’ and Landon’s injury. 3M further asserted it did not manufacture or use vinyl chloride; it only manufactured the badges used to monitor the level of the substance present at the work site. The trial court *357 granted the defendants’ motions for partial summary judgment. Plaintiffs filed this appeal and have assigned the following errors for our review:
1. The trial judge mistakenly held that co-conspirators are not deemed to have committed the acts of other co-conspirators, i.e., handling vinyl chloride under La.Civ.Code art. 2315.3, and as such, the trial judge erroneously dismissed the plaintiffs’ claims for punitive damages under article 2315.3.
2. The trial judge mistakenly held that the non-employer defendants who issued inappropriate warnings, manufactured/used vinyl chloride, and/or concealed the health effects of vinyl chloride from the plaintiffs did not handle, store, or transport vinyl chloride under La. Civ. Code art. 2315.3, and the trial judge erroneously dismissed plaintiffs’ claims for punitive damages.
For the reasons which follow, we reverse the trial court’s judgment, hold exemplary damages may be assessed against the non-employer defendants for their individual involvement in events integrally related to the storage, handling, or transportation of hazardous or toxic substances in violation of La.Civ.Code art. 2315.3, reinstate plaintiffs’ claims for punitive damages, and remand this case for | ¿further proceedings.
Standard of Review
The propriety of a trial judge’s grant of summary judgment is a question of law which we review de novo. Curtis v. Rome, 98-0966 (La.App. 4 Cir. 5/5/99); 735 So.2d 822. Summary judgment is granted only if there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. Id. Typically, the question of availability of a summary judgment focuses on whether genuine issues of material fact exist. Here, the facts are relatively unquestioned. The issue is whether these facts, as set forth in the pleadings, permit recovery under La.Civ. Code art. 2315.3. We conclude they do.
LAW AND ARGUMENTS
It is common knowledge the foundation of conspiracy law is to treat all co-conspirators as one. Tabb v. Norred et al., 277 So.2d 223 (La.App. 3 Cir.), writ denied, 279 So.2d 694 (La.1973); Rivera v. United Gas Pipeline Co., 96-502 (La.App. 5 Cir. 6/30/97); 697 So.2d 327, writs denied, 97-2030 (La. 12/12/97); 704 So.2d 1196, 97-2031 (La.12/12/97); 704 So.2d 1197. The term “conspiracy” generally means a plan by two or more persons to accomplish some unlawful, immoral, criminal or evil purpose either as a means or as an ultimate end. Id. at 228; Hall, et ux. v. Lilly, et al., 29,624 (La.App. 2 Cir. 6/18/97); 697 So.2d 676. La.Civ.Code art. 2324(A), provides: “He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.” Once the conspiracy has been established, “the act done by one in furtherance of the unlawful design is in law the act of all.” Tabb v. Norred, 277 So.2d at 228. The term “an unlawful act” does not mean necessarily a criminal act; it means a wrongful act, tort, or any wrongful act, not involving a breach of contract, for which a civil action will lie. National Union Fire Ins. Co. of Pennsylvania v. Spillars, 552 So.2d 627 (La.App. 2 Cir.1989), unit denied, 556 So.2d 61 (La.1990) (citing Hartman v. Greene, 193 La. 234, 190 So. 390, 391 (1939)). The actionable element in a conspiracy claim is not the conspiracy itself. Rather, it is the tort which the conspirators agree to perpetrate and which they actually commit in whole or in part. The Louisiana Supreme Court long ago held “when a tort is perpetrated through the instrumentality of a combination or *358 conspiracy, the party wronged and injured may look beyond the actual participants in committing the injury, and join with them, as defendants, all who cooperated in, advised, or assisted in the accomplishment of the common design, for co-trespassers are bound in solido.” Rush v. Town of Fannerville, 156 La. 857, 101 So. 243 (1924).
To recover when relying on a conspiracy theory, a plaintiff also must prove that an agreement existed to commit an illegal or tortious act which resulted in the plaintiffs injury. Butz v. Lynch, 97-2166 (La.App. 1 Cir. 4/8/98); 710 So.2d 1171. If no actual damage results from something done by one or more of the conspirators in furtherance of the object of the conspiracy, no civil action lies against anyone. Id. However, if a conspiracy is conceived and executed and private injury results, the one so injured has a right of action against all of the conspirators. Id.
This appeal questions whether plaintiffs may recover exemplary damages from the non-employer defendants whom they alleged conspired with the employer defendants to recklessly “store, handle, or transport” hazardous materials during the period Louisiana Civil Code article 2315.3[2] was still in effect. Before its repeal, this article provided:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiffs injuries were caused by the defendant’s wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic | ^substances.
The case squarely focuses on the “status” of the non-employer defendants and whether the legislature when enacting arti-ele 2315.3 intended to include within its reach defendants whose concerted activities may have aided and encouraged those who actually “stored, handled, or transported” the chemical in doing so wantonly, recklessly, and without regard for public safety.
Several non-employer defendants argue even if they participated in a “conspiracy” with the employer defendants as alleged, they are not liable for punitive damages in this instance because article 2315.3 is sui specific and does not include all actors “who conspire to commit an unlawful and willful” act as contemplated by article 2324. They contend article 2315.3 applies only to those who actually “stored, handled, or transported” the substance and who wrongly exposed the public to it. Referencing Dumas v. Angus Chem. Co., 31-398 (La.App. 2 Cir. 12/9/98); 728 So.2d 434, writ denied, 99-0397 (La.4/9/99); 740 So.2d 631 and In re New Orleans Train Car Leakage Fire Litig., 95-2710 (La.App. 4 Cir. 3/20/96); 671 So.2d 540, writ denied, 96-0978, 96-0977, 96-1311, 96-1287 (La.6/28/96); 675 So.2d 1121, cert, denied, 519 U.S. 1009, 117 S.Ct. 512, 136 L.Ed.2d 402 (1996), 3M, BF Goodrich and Shell Oil Company contend the “Louisiana courts consistently have held that, to be subject to liability under article 2315.3, a defendant must itself have actually and physically stored, handled, or transported the particular hazardous substance involved in the accident or exposure that allegedly caused the plaintiffs injuries.” The Society of the Plastic Industry, Inc. argues it is the elements of control or possession of the substance that governs the status of those defendants who fall within the ambit of article 2315.3.
*359 Chevron U.S.A., Inc. argues the only activity plaintiffs complain the non-employer defendants engaged in was issuing inadequate warnings. It urges the “promulgation of inadequate hazard warnings' — no matter how intentional it may be, 17no matter that it may be the fruit of a conspiracy — -does not constitute ‘storage, handling, or transportation’ within the meaning of former article 2815.3.” Citing a federal district court holding in Williams v. A.C. & S., Inc., 700 F.Supp. 309, 310 (M.D.La.1988), Chevron argues such claims fall outside the purview of former article 2315.3 and directs our attention to the following language in the Williams case:
Even assuming arguendo that asbestos is a hazardous or toxic substance, article 2315.3 still does not apply under the facts of this case to allow plaintiff to recover exemplary damages. Plaintiff does not allege he was injured as a result of the defendants’ “storage, handling, or transportation” of asbestos. Defendants’ fault, if any, arises from the manufacture, design, and labeling of the products — conduct, which, although within the realm of products liability, lies outside the scope of article 2315.3.
The labeling of a hazardous product, Chevron insists, does not constitute one of the three activities contemplated in article 2315.3 — the handling, storage, or transportation of the chemical.
All the defendants maintain plaintiffs’ reliance on the conspiracy principle found in article 2324 to attach punitive liability to them is misplaced. This statute, they contend, does nothing more than extend “soli-dary,” as opposed to joint and divisible, liability to joint tortfeasors. A conspiracy, they assert, is not a tort and the cause of action is not the conspiracy — it is the tort the parties conspired to commit, to the extent they have actually committed it. And, article 2324 by referring to “damage,” which they maintain is synonymous with “injury,” addresses only compensatory damages — the recompense for injury. Defendants, reiterating prior court pronouncements, point out punitive damages are awarded to punish, not to compensate, the injured tort victim, “and to encourage private citizens to seek the societal vindication that punitive damages embody.” They argue holding all conspirators responsible in solido for the misdeeds of one conspirator whose conduct falls within the ambit of the Act would deviate from the holding in James v. Formosa Plastics Corp. of La., 95-1794 (La.App. 1 Cir.); 672 So.2d 319, 322, writ denied, 683 So.2d 285 (La.1996), which recognized punitive damages are assessed against individual actors based on their independent culpability.
Plaintiffs maintain the non-employer defendants, by their own conduct, assisted the employer defendants in recklessly exposing Ross and Landon to this known carcinogen. They further argue it does not matter if the non-employer defendants did not, themselves, physically “store”, “handle”, or “transport” the vinyl chloride since the act or acts of one co-conspirator becomes the act of all. They suggests the non-employer defendants “stored, handled, or transported” the vinyl chloride because their co-conspirators — the employer defendants — stored, handled, or transported it, and because the non-employer defendants took definitive independent steps to further the employer defendants’ objective, i.e., conceal vinyl chloride’s known harmful effects. The amending petitions filed by the heirs of Ross and Landon alleged the non-employer defendants:
At various times between 1960 and the present, the conspiring defendants conspired among themselves, conspired with their trade associations which included the Manufacturing Chemists Association (MCA), the Chemical Manufac *360 turers Association (CMA), the Vinyl Chloride Safety Association (VCSA), the Society of Plastics Industries (SPI), as well as the various committees (HSEC), the MCA Medical Advisory Committee, the MCA and CMA Occupational Health Committee, the MCA VCM Toxicity Subcommittee, the MCA Ad Hoc Planning Group Research (TTGVCR) and the CMA Vinyl Chloride Panel (VCP) — , the CMA Vinyl Chloride Program Panel and Vinyl Chloride Project Panel (VCPP), the MCA and the CMA Vinyl Chloride Research Coordinators (VCRC), the Medical Subcommittee or Sub-Task Group of the TTGVCR, the Work Practices subcommittee or Sub-Task Group of the TTGVCR, and the Industrial Bio-test audit task force of the VCPP( all hereinafter collectively referred to as “their trade associations”) to commit the following intentional and/or willful acts:
a.The conspiring defendants, along with and through their trade associations, intentionally and/or willfully untruthfully misrepresented their present and historical knowledge of the nature and extent of the hazards posed by vinyl chloride and the diseases caused by vinyl chloride, they did this in concert with one another through their trade, business, and | gsafety associations because of their common interest in minimizing the expense of providing their employees with a safe place to work, minimizing government regulations of their industry, minimizing their cost of doing business, minimizing difficulty with unions and work forces, and generally minimizing all costs which they knew they would be forced to incur if and when the true nature and extent of the hazards posed by vinyl chloride became known by [Landon and Ross] and other workers in the vinyl chloride industry, the medical community, the industrial hygiene community, the toxicology community, the press, and the general public;
b. Although the conspiring defendants, along with and through their trade associations, were aware that vinyl chloride was a multi-potential carcinogen (capable of causing different types of cancer at different sites of the human body) at least as early as the early 1970’s, they intentionally and/or willfully failed to disclosed this information to the public, to the United States Government, and to the workers in the vinyl chloride industry, including [Landon and Ross];
c. Although the conspiring defendants, along with and through their trade associations, were aware that the carcinogenicity of vinyl chloride had been demonstrated in numerous toxicological studies and bioassays conducted in Europe in the 1960’s, the conspiring defendants agreed among themselves, along with and through their trade associations, to keep this information secret from the public, the United States Government, and vinyl chloride workers, including [Landon and Ross]. Thus although the conspiring defendants, along with and through their trade associations, were aware of the carcinogenic effects and/or potential carcinogenic effects of vinyl chloride exposure, at least as early as the early 1970’s, the conspiring defendants, along with and through their trade associations, intentionally and/or willfully kept this information secret;
d. In 1972, the chemical safety data sheet “SD-56” on vinyl chloride was published by the Manufacturing Chemists Association under authority of the conspiring defendants. This *361 was a document that the conspiring defendants, along with and through their trade associations, intended to be relied upon by the government, the public, and the workers in the vinyl industry, including [Landon and Ross]. However, this publication intentionally and/or willfully misrepresented the information known at the time regarding the nature and extent of health hazards of vinyl chloride exposure and/or did not include information pertinent thereto. Through this publication the public, Government, and vinyl chloride workers were intentionally and/or willfully mislead regarding the nature and extent of health hazards of vinyl chloride. Moreover, SD-56 was continued |into be published and released despite the knowledge of the conspiring defendants, along with and through then-trade associations, that cancers had been reported as a result of low dose exposure to vinyl chloride;
e. Although the conspiring defendants, along with and through their trade associations, sent representatives to meet with United States Government agencies in July of 1973, the conspiring defendants, along with and through their trade associations, developed and followed a prearranged script to withhold information regarding the nature and extent of the health hazard of vinyl chloride exposure and/or to mislead the Government officials regarding the nature and extent of the health hazard of vinyl chloride exposure;
f. When proposing their own studies and despite the knowledge that then studies were “cancer” studies, the conspiring defendants, along with and through their trade associations, agreed among themselves to remove any reference to cancer and/or carcinogenicity in information disseminated about the studies and to “defocus” the cancer aspect of the studies. Thus, they intentionally and/or willfully mislead the Government and the public regarding the true nature, intent, and significance of the studies;
g. Despite their knowledge of the carcinogenic hazards of vinyl chloride exposure, the conspiring defendants, along with and through their trade associations, intentionally and/or willfully delayed and/or suppressed research projects concerning these hazards. Specifically, they intentionally and/or willfully decided to postpone epidemiological studies until they had done animal studies even though they were aware that animal studies in Europe had already shown carcinogenic results of vinyl chloride exposure;
h. The conspiring defendants, along with and through their trade associations, intentionally and/or willfully avoided the sponsorship of product oriented research. Specifically, they required “board” approval before undertaking product oriented research in order to minimize the chance of results unfavorable to the industry about vinyl chloride exposure, In this regard, they intentionally and/or willfully failed to sponsor and/or publish studies they deemed unfavorable to themselves and pursued studies in concert with each other only if they had “up side potential” to the vinyl industry;
i. The conspiring defendants, along with and through their trade associations, intentionally and willfully sponsored inaccurate and misleading studies which were published in the medical literature and relied upon by the medical profession, safety experts, professional in the field of in *362 dustrial hygiene, occupational medicine toxicology, epidemiology, and public health, the Government organized labor, management, and the general public, These studies intentionally and/or willfully misrepresented the nature and Inextent of the diseases caused by vinyl chloride in workers such as [Landon and Ross];
j. In writing the protocols for their various studies concerning the health hazards of vinyl chloride exposure, the conspiring defendant, along with and through their trade associations, intentionally and/or willfully changed and manipulated the protocols so as to produce more favorable, albeit misleading, results;
k. The conspiring defendants, along with and through their trade associations, intentionally and/or willfully made substantive changes on final copies and drafts of the results of various research projects, thereby intentionally and/or willfully manipulating and/or changing the results so as to diminish the nature and extent of the hazards posed by vinyl chloride;
l. The conspiring defendants, along with and through their trade associations, intentionally and/or willfully withheld, suppressed, and misrepresented knowledge regarding the nature and extent of the hazards of vinyl chloride exposure, As a result, vinyl chloride workers, including [Landon and Ross], were intentionally and/or willfully exposed to unsafe levels of vinyl chloride;
m. Therefore, the conspiring defendant, along with their trade associations intentionally and/or willfully collectively formulated and disseminated misleading, incomplete, and false information concerning the nature and extent of the hazards posed by vinyl chloride, including cancer, all the while intentionally and/or willfully concealing the truth from the Government, from the medical community, from vinyl chloride workers, from [Land and Ross], and from the general public.
In addition, Landon’s petition alleged:
n. Although the conspiring defendants, along with their trade associations, studied vinyl chloride workers, including Clarence H. Landon, concerning the workers’ exposure to vinyl chloride, and although these studies were in actuality “cancer” studies, the conspiring defendants manipulated the title, protocols, and results of these studies, thereby intentionally and willfully depriving Clarence H. Landon and other vinyl chloride workers of the true nature and extent of their exposure to vinyl chloride and the true hazards, including liver cancer and other types of cancer, related to vinyl chloride exposure in the work place. This resulted in Clarence H. Landon and other workers going to work in the vinyl industry, thinking that they were not being harmed by exposure to vinyl chloride when, in fact, they were, and resulted in workers such as Clarence H. Landon contracting liver cancer;
o. Clarence Landoris direct employer, Conoco and Vista, |1gwere members of the vinyl chloride trade associations name herein during Clarence Landoris employment. As part of that membership, Conoco had to sign a secrecy agreement concerning hazards of vinyl chloride exposure. Specifically, the secrecy agreement prohibited Conoco from disclosing to the public, to the government, and to its workers the results of Europeans studies, As such the conspiring defen *363 dants, through their trade associations, intentionally prohibited Clarence H. Landon from finding out the true hazards concerning vinyl chloride, which included liver cancer.
Landon’s petition also detailed the conduct it complained 3M engaged in which subjected it to the reach of article 2315.3 as follows:
30.
Beginning as early as the mid 1970’s Minnesota Mining and Manufacturing Company (sometimes called “3M”) and Conoco began a series of validation tests of the 3500 and 3520 passive dosimeters (hereinafter sometimes called the “passive dosimeter”), which were personnel monitoring devices manufactured by 3M. The purpose of validation tests included the evaluation of the ability of the passive dosimeters to accurately detect the level of vinyl chloride in the atmosphere.
31.
At the time of the validation tests, Conoco, Inc. and other conspiring defendants were using the passive dosimeters at their vinyl chloride production facilities so as to appear to comply with governmental regulations pertaining to workplace exposure to vinyl chloride and, pursuant to those same regulations, to inform workers such as Clarence H. Landon as to the nature and extent of their occupational exposure to vinyl chloride. At that time and prior thereto, 3M was aware that the passive dosimeters were being used in this manner.
32.
The results of the validation tests demonstrated that 3M passive dosimeters consistently underestimated the true levels of vinyl chloride exposure in the atmosphere were significantly higher than the dosimeters revealed or reported to an employee or those monitored. This was primarily due to the fact that the passive dosimeters relied on charcoal as the medium for the absorption of vinyl chloride and subsequent analysis. Charcoal was extremely “lossy” for vinyl chloride, and therefore, the use of charcoal consistently underestimated the actual levels of vinyl chloride encountered by the person wearing the passive dosimeter.
33.
Due to the participation on the various task forces, the conspiring defendants were aware of the inability of charcoal to measure levels of vinyl chloride. However, the results were kept in confidence.
_iig34.
3M and the conspiring defendants were, therefore, aware as of at least the mid 1970’s that the passive dosimeters were inaccurate for measuring exposure to vinyl chloride in the work place. Despite this knowledge, 3M and other conspiring defendants repeatedly, expressly and implicitly represented that the use of charcoal as an absorbent medium had been validated by government agencies and the vinyl industry, all the while knowing this was false. In fact, 3M and Conoco used charcoal and other inaccurate charcoal methods to erroneously validate passive dosimeters.
35.
The passive dosimeters were continued to be manufactured by 3M for use in the vinyl industry and were continued to be used by many employers in the vinyl industry, including Conoco (and later Vista), for such crucial matters as determining the extent of employees’ expo *364 sure to vinyl chloride, determining employers’ compliance with governmental regulations, determining whether employees were subject to special medical and industrial hygiene monitoring and reporting requirements required by law, determining when employees would be informed of their overexposure to vinyl chloride, what such employees would be told about their exposures and many other important legal requirements which the employers knew would be triggered by employee monitoring results reflecting vinyl chloride exposures above “action levels” and “permissible exposure limits” set by OSHA.
36.
Numerous follow up studies demonstrated the inaccuracy of the 3M passive dosimeter and of charcoal based monitoring for vinyl chloride exposure.
37.
As such, 3M and the other conspiring defendants intentionally overexposed employees in the vinyl chloride industry, including Clarence H. Landon. Although 3M and other conspiring defendants were aware that passive dosimeters inaccurately reflected employee exposure to vinyl chloride, these passive dosimeters were used to monitor vinyl chloride workers, including Clarence H. Landon. Employees in the vinyl industry, including Clarence H. Landon, were therefore intentionally deprived of the knowledge of the true nature and extent of their exposure to vinyl chloride. Thus, although 3M and the other conspiring defendants were aware that vinyl chloride was a carcinogen, 3M continued to manufacture the passive dosimeter for inaccurate monitoring of vinyl chloride and employers in the vinyl industry, including Clarence H. Landon’s employer, continued to use the passive dosimeters to inaccurately monitor their employees. Such actions and inactions constitute battery and fraudulent misrepresentation under Louisiana Law and constituted other intentional misconduct. By such conduct, 3M and other conspiring defendants knew and/or it was substantially certain that workers in the vinyl industry, including Clarence H. Landon, would be overexposed to vinyl chloride and | usubsequently sustained harm as serious as liver cancer ...
Plaintiffs argue the specific independent conduct of the non-employer defendants, noted above, place them within the reach of article 2315.3. In support of this position, they cite the fifth circuit’s holding in Rivera, 697 So.2d 327, which affirmed a determination that a principal could be held vicariously liable for punitive damages stemming from the acts of an agent. The court in Rivera stated:
It seems to us that to hold that the negligence of an agent cannot be imputed to the principal in awarding punitive damages would have the effect of virtually eliminating punitive damages awards. Likewise, in order to avoid punitive damage liability, a corporation would simply have to create a separate entity to perform the hazardous activities, thus insulating itself from punitive liability. To allow punitive liability to be so easily sidestepped runs counter to the legislature’s public policy concerns in imposing punitive damages in certain enumerated situations. As such, we find that negligence for punitive damages, like any other type of negligence, may be imputed to a principal through the acts of an agent.
Rivera, 697 So.2d at 336.
They assert the relationship between the employer and non-employer defendants in *365 this case is analogous to the principal/agent relationship described in Rivera. In fact, they urge the conspiratorial relationship in this case is even greater. And the same evil envisioned in Rivera is present here; exempting the relationship complained of in this case from the ambit of 2315.3allows the non-employer defendants to insulate themselves from punitive responsibility by acting through others who “store, handle, or transport the hazardous substance” and who recklessly expose the public to it. Punitive damages, they contend, “focus on the wrongful conduct” and its “purpose is to punish the defendants and teach them not to do it again.” “To punish one co-conspirator,” they maintain, “and not the others would be contrary to this [legislative] purpose.”
ANALYSIS
|1sWe are not compelled, as defendants urge, by the holding in Formosa Plastics, 672 So.2d 319, to reject plaintiffs’ punitive damage claim, though it stems from an alleged conspiracy. Addressing whether the defendants in Formosa Plastics could be held solidarity liable for exemplary damages pursuant to article 2315.3, the First Circuit Court of Appeal noted:
Punitive damages are to be regarded as a fine or a penalty for the protection of the public interest. These damages are provided the plaintiff over and above the full compensation for his injuries, they are provided for the purpose of punishing the defendant, of teaching the defendant not to do a certain act again, and of deterring others from following the defendant’s example.
Formosa Plastics, 672 So.2d at 323.
With this purpose in mind, the court then held:
... [E]xemplary and punitive damages do not meet the criteria established by the Louisiana Supreme Court for soli-dary obligations. It is the coextensiveness of the obligations for the same debt, not the source of liability, that determines the solidarity of the obligation. The primary effect of the soli-dary liability is that any tortfeasor could be compelled to pay the entire judgment. Touchard v. Williams, 617 So.2d 885 (La.1993). In contrast, the purpose of punitive damages is to teach the defendant not to engage in such conduct again. To accomplish this ... punitive damages are assessed against individual defendants based on their culpability; the punitive damage award is their individual debt.
Formosa Plastics, 672 So.2d at 323.
Extrapolating from the language found in Formosa Plastics, defendants assert article 2324 cannot be used in this instance to place them within the ambit of article 2315.3because any conspirator referred to in that article could be compelled to pay the entire judgment — thus assuming the debt of the other conspirators. This, they contend, is fundamentally antithetical to the purpose underpinning the enactment of article 2315.3. That article, they insist, seeks to punish individual actors — not conspiratorial relationships. The latter conduct, they argue, is appropriately addressed only when assigning liability for compensatory damages — not punitive damages.
Although we agree treating all conspirators as one when ultimately assessing \ ^monetary liability for the harm occasioned by a violation of article 2315.3 or forcing one to pay the debt of the others may defeat the underlying purpose of exemplary damages, such recognition in this instance is only superficially relevant. Neither the language in former article 2315.3nor public policy require that we ignore the conduct plaintiffs complain each *366 actor engaged in as participants in the alleged conspiracy to violate article 2315.3. Their acts, plaintiffs complain, occurred in combination and resulted in the mishandling, improper storage, and unsafe transportation of the chemical the decedents eventually were exposed to which caused them injury. In Formosa Plastics, the Court correctly noted while “neither [defendant] could be compelled to pay the judgment of the other,” both could be sued under article 2315.3. Although it is true the court in this instance cannot assign liability among the conspirators in solido as provided by article 2324, the lack of monetary “solidarity” between the actors does not exempt them from the reach of article 2315.3. Nothing prevents the court from ultimately assessing punitive damages against each conspirator based on their individual culpability.
Whether the non-employer defendants fall within the ambit of article 2315.3, ultimately turns on the specific acts each undertook in furtherance of the alleged conspiracy and whether those acts constituted the wanton or reckless disregard for public safety, envisioned by the legislature, “in the storage, handling, or transportation ” of the hazardous or toxic substance which caused plaintiffs’ injuries.
Though the jurisprudence addressing this status question is sparing, we find the Fourth Circuit’s holding in In re New Orleans Train Car Leakage Fire Litigation, 671 So.2d 540, informative. In NOTC, an explosion and fire resulted from a leaking railroad tank car containing butadiene exposing residents to the hazardous substance. Plaintiffs alleged the leak and resultant fire were caused by a defective or improperly installed gasket on the tank which was ignited by an outside source, possibly a phot light on an 117external water heater. All the defendants claimed they could not be held liable under article 2315.3 “because of ‘status’ issues.” “In other words,” as the court re-framed the question, “the defendants claimed that the evidence presented in the trial on the motion for summary judgment established] that they [were] entitled to judgment as a matter of law because it show[ed] that they were not involved in the ‘storage, handling or transportation’ of the buta-diene at the time of the accident, as required for liability under [La.Civ.Code art.] 2315.3.” In reviewing the status question, the court examined each of the defendants’ activities in relation to the tank car. The court held several named defendants in NOTC were clearly exempt from the punitive reach of article 2315.3 because they did not have “some possession or control over the hazardous substance prior to the victim’s injuries” or had no “connection” with the substance and therefore was not involved in the actual storage, handling, or transportation of it. But the court found the other defendant, though they too did not actually “store, handle, or transport” the chemical at the time of the explosion, might have responsibility for exemplary damages. In so holding, the Fourth Circuit specifically noted “[n]othing in the express language of the statute requires a finding that a person or entity be physically involved with the hazardous substance at the time the incident occurs as a prerequisite to liability.” In re New Orleans Train Car Fire Litigation, 671 So.2d at 548. The court then found several defendants, though they were not in actual possession or control of the substance at the time of the railroad incident, were potentially liable under 2315.3 because they were involved in a “series of events related to the transportation of the [substance]” and “could be held hable ... for ... exemplary damages, if the plaintiffs [could] prove that [they] performed [their] duties in a wanton and reckless manner.” In re New Orleans Train Car *367 Fire Litigation, 671 So.2d at 549. It is the “series of events related” to the handling, storage, and transportation of the vinyl chloride plaintiffs alleged occurred in this case|1Rthat we find potentially subjects the non-employer defendants to liability under La.Civ.Code art. 2315.B if plaintiffs can show their conspiratorial conduct was in wanton and reckless disregard for public safety and caused the injuries suffered by Landon and Ross.
We have carefully reviewed the Second Circuit Court of Appeal holding in Dumas v. Angus Chemical Co., 728 So.2d 434, and find it correctly held the defendant in that case was not liable for exemplary damages because it did nothing more than design the processing tank in which the chemical that exploded was contained and no allegation was raised that it did so wantonly and recklessly. Although plaintiffs in Dumas attempted to rely on the “series of events” language used by the Fourth Circuit in NOTC and argued “all parties in the series of events connected with the handling, storage and transport of the hazardous or toxic substances” ought to be included within the reach of La.Civ.Code art. 2315.3, the Second Circuit rejected their position finding it was nothing more than an attempt “to expand the application of this article.” We too agree the conduct complain of occurred in Dumas — the designing of a processing tank, though possibly connected with the handling, storage, and transportation of a hazardous substance — was too remote from the prohibited conduct targeted by the Legislature when it adopted La.Civ.Code art. 2315.3.
The conduct plaintiffs complain occurred in this case, however, is not so removed from, or distantly related to the activities covered under La.Civ.Code article 2315.3, that inclusion of the non-employer defendants within its reach would require us to broaden the language of the statute or unfairly subject them to punitive liability without notice that their conduct could be found in wanton and reckless disregard of public safety. Plaintiffs allege the non-employer defendants knew they were engaging in conduct which exposed the public to a hazardous substance and they sought in concert to avoid the reach of state and federal statutes, regulations and inspections. l19The pleadings assert these defendants deliberately and with forethought took definitive steps to conceal the danger posed by vinyl chloride and acted in concert with Conoco — later Vista — (the employers of Ross and Landon) and others to deliberately and consciously influence the manner in which vinyl chloride was “handled, store, and transported;” and they did so in wanton and reckless disregard for public safety. We will not repeat each act plaintiffs alleged the non-employers engaged in which have been recited above; suffice it to say genuine issues of material fact concerning their liability still exist, and the trial court improperly granted the motion for summary judgment on the issue of exemplary damages.
Moreover, though defendants cannot be punished as a group or held accountable solely based on the activities of others, they are not exempt from punitive liability which may stem from their concerted conduct. And, though it is also true they engaged in a conspiracy which may subject them to in solido compensatory liability under 2324, this reality alone does not abate their potential individual responsibility for violating La.Civ.Code art. 2315.3 as well.
DECREE
For the foregoing reasons, the trial court’s granting of the partial summary judgments dismissing plaintiffs’ exemplary damages claims against the non-employer *368 defendants is reversed. Plaintiffs’ claims for damages are reinstated, and this case is remanded for trial on the merits. All costs of this appeal are assigned to the defendants.
REVERSED AND REMANDED.
AMY, J., dissents and assigns written reasons.
DECUIR, J., dissents for the reasons assigned by AMY, J.

. In the case brought by the Landon family, the conspiracy allegation was made in the original petition, filed in 1997. See Clarence London, et ux. v. Conoco, Inc., et al., 00-1758 (La.App. 3 Cir. 12/26/01); 805 So.2d 352, for disposition of the companion case.

. Louisiana Civil Code art. 2315.3 was repealed by Acts 1996, 1st Ex.Sess., No. 2 § 1, eff. April 16, 1996.