**16-550**


**EVERETT CUROLE, JR., ET AL.**

**VERSUS**

**RORY DELCAMBRE, ET AL.**


**\*\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**FIFTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF VERMILION, DOCKET NO. 79,580**
**HONORABLE MICHELLE M. BREAUX, PRESIDING**
**\*\*\*\*\*\*\*\*\*\***


**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Phyllis M. Keaty, Judges.

**REVERSED AND RENDERED.**

Carl J. Rachal
Simon Law Offices
1408 West Pinhook Rd., Suite A
Lafayette, LA 70503
(337) 232-2000
**ATTORNEY FOR PLAINTIFFS/APPELLANTS**
   Everett Curole, Jr., et al.

Anthony J. Fontana, Jr.
210 N. Washington Street
Abbeville, LA 70510
(337) 898-8332
**ATTORNEY FOR DEFENDANTS/APPELLEES**
   Rory Delcambre and Bonnie Delcambre

Allan L. Durand
235 La Rue France
Lafayette, LA 70508
(337) 237-8501
**ATTORNEY FOR DEFENDANT/APPELLEE**
   Lori F. Toups

**COOKS, Judge.**

This matter arose out of an incident that took place in the early morning hours of December 21, 2002. It is undisputed that seven individuals, namely Rory Delcambre, Bonnie Delcambre, Tricia Menard, Quinn Delcambre, Rayford Champagne, Glenn P. Gadrow and Lori Toups, arrived in three vehicles at the residence of Everett and Charlene Curole shortly after 3:00 a.m. It was further established that the Curole's residence was broken into, and a brutal physical attack was committed upon Mr. Curole in the Curoles' bedroom. Mr. Curole sustained serious injuries as a result of punches and kicks he received during the assault.

Briefly, the facts indicate several hours before the attack, the Curoles were at the Café Museum bar in Erath, when they encountered Lori Toups and her companion, Glenn Gadrow. Lori recounted that Charlene Curole made some negative comments to her about Bonnie Delcambre. Lori further testified that Charlene threatened "to beat the crap out of [Bonnie] and kill her." At some point in the evening, the Curoles left Café Museum and returned to their home in Erath.

Shortly after speaking with Charlene Curole at the bar, Lori Toups called Bonnie Delcambre and told her what had allegedly been said about her by Charlene Curole. Lori Toups made several calls to Bonnie Delcambre that evening. At the time, Bonnie Delcambre, Rory Delcambre, Quinn Delcambre, Tricia Menard and Rayford Champagne were at a Christmas party for a company that was partially owned by Rory Delcambre.[1]

After the cell phone calls began, the Delcambre defendants left the Christmas party and went to a bar called the Boat Dock. Lori Toups and Glenn Gadrow showed up at the Boat Dock shortly thereafter. Lori Toups began

---

[1] The record established Rory and Bonnie Delcambre were married. Trisha Menard and Quinn Delcambre were Rory and Bonnie's children. Rayford Champagne was Trisha's fiancé at that time.

speaking to Bonnie Delcambre about her conversation with Charlene Curole. Bonnie Delcambre testified she became enraged at what she was told.

As she became more angry, Bonnie Delcambre decided she was going to confront Charlene Curole over the comments. She abruptly left the bar and proceeded to her vehicle in the parking lot. She was followed out of the bar by the others. Bonnie Delcambre then got in her vehicle, accompanied by Rory Delcambre, Trisha Menard and Rayford Champagne. Lori Toups and Glenn Gadrow followed in another vehicle, and Quinn Delcambre later joined the caravan in his vehicle.

They first stopped at Café Museum, where Lori Toups had previously encountered the Curoles. Upon discovering the Curoles were not there, the group then proceeded to another bar, The Oaks. Once again, they discovered the Curoles were not present at that bar. At this point, Bonnie Delcambre decided to go to the Curoles' residence to confront Charlene Curole. The three vehicles then proceeded to the Curoles' residence.

After arriving, Bonnie Delcambre went to the front door of the Curoles' mobile home and kicked it in. *All seven of the defendants then entered the mobile home*. Bonnie Delcambre went to the Curoles' bedroom, where they were sleeping. Bonnie Delcambre woke up Charlene Curole to confront her about the comments she allegedly made to Lori Toups. While this was occurring, Everett Curole testified he woke up and saw Bonnie Delcambre and three men standing at the foot of his bed. Mr. Curole then sustained a severe beating from several of the men, identified at trial as Rory Delcambre, Quinn Delcambre and Glenn Gadrow.

While the assault upon Mr. Curole was ongoing, the others punched holes in the walls of the Curoles' residence. The defendants then left the scene, leaving Mr. Curole bloodied and beaten.

Charlene Curole called 911 to report the incident. Shortly thereafter, deputies from the Vermilion Parish Sheriff's Office (VPSO) arrived at the Curoles' residence at 4:12 a.m., and took statements from the Curoles. Mr. Curole was transported from the scene by ambulance to the emergency room of Abbeville General Hospital. He sustained a broken nose, broken/cracked ribs, multiple lacerations to his face and head, and a laceration to his kidney.

Upon leaving the Curoles' residence, all of the defendants except Quinn Delcambre went to have breakfast at a nearby restaurant. When Quinn Delcambre arrived home, there were officers from the VPSO waiting. Quinn Delcambre was questioned by police and gave a statement. He then phoned his mother to tell her that police would be heading to her residence to question her about the incident. All of the remaining defendants headed to the home of Bonnie and Rory Delcambre, where they were met by the police. Subsequently, Rory Delcambre, Bonnie Delcambre, Lori Toups and Glenn Gadrow went to the VPSO to give statements.

Following their investigation, the Sheriff's Office filed criminal charges against Bonnie Delcambre, Quinn Delcambre and Glenn Gadrow. A civil lawsuit was filed on March 26, 2003 by the Curoles, on behalf of each other and their two minor children (Jonathan and Nicholas), against Rory Delcambre, Bonnie Delcambre, Tricia Broussard, Quinn Waguespack and Glenn Gadrow. On March 15, 2005, the petition was amended to correct the names of Tricia Broussard to Tricia Menard and Quinn Waguespack to Quinn Delcambre. The petition was also amended to add Lori Toups, Rayford Champagne and State Farm Insurance Company (the insurer of Bonnie and Rory Delcambre) as additional defendants.

State Farm subsequently filed a motion for summary judgment, contending the intentional act exclusion barred any recovery under its policy issued to the

4

Delcambres. The trial court granted the motion, dismissing State Farm from the claims made by the Curoles.

Defendants Glenn Gadrow and Rayford Champagne did not file answers to the Curoles' petition. Thus, the Curoles sought a preliminary default against those defendants. On July 8, 2010, the preliminary default was obtained against the two defendants. After a confirmation hearing, the trial court found the evidence established that "defendant Glenn P. Gadrow and defendant Rayford Champagne were acting in concert with each and the other named defendants to commit intentional and willful acts upon Everett Curole and Charlene Curole to include the unauthorized entry of the Curoles' inhabited dwelling and the assault and battery upon Everett Curole and Charlene Curole[.]" Accordingly, the trial court found the two defendants liable in the following amounts[2]:

| | |
|---|---|
| Everett Curole, General Damages | $150,000.00 |
| Everett Curole, Special Damages | $ 54,413.67 |
| Charlene Curole, General Damages | $ 50,000.00 |
| Nicholas Curole, Loss of Consortium Damages | $ 25,000.00 |
| Jonathan Curole, Loss of Consortium Damages | $ 25,000.00 |

The five remaining defendants filed a Petition to Annul the default judgment granted against defendants Glenn Gadrow and Rayford Champagne, contending the trial court erred in signing the submitted judgment that found those defendants "were acting in concert with each and the other named defendants to commit intentional and willful acts" on the Curoles. They maintained the "minutes of Court attached hereto prove that the Court made no such finding of 'acting and concert', nor could the Court have made such a finding as the [Curoles] never pleaded conspiracy in any pleading filed, nor any facts that would allege conspiracy." The Curoles filed an Exception of No Cause of Action to the defendants' Petition to Annul. On August 22, 2011, the trial court granted the

---

[2] We note, due to the fact the lawsuit was filed in 2003 and its procedural history spanned over a decade, there were several different trial judges who made rulings in this case.

5

Curoles' Exception of No Cause of Action and dismissed defendants' Petition to Annul.

With respect to the other five defendants, the Curoles then filed a Motion for Summary Judgment seeking to enforce the preliminary default judgment against them on the basis they were all liable *in solido*. That summary judgment was opposed by the remaining defendants. In opposing the motion, Lori Toups maintained the Curoles had not alleged any conspiracy among the defendants, or that Lori Toups had assisted or encouraged the attack on Everett Curole. The other defendants also opposed the motion, similarly alleging the Curoles failed to allege any conspiracy or agreement to cause any injury to the Curoles. They also denied being involved in the infliction of any injury upon the Curoles. The trial court denied the motion for summary judgment.

The matter then went to a bench trial on the merits which commenced on October 26, 2015. After hearing evidence and argument of counsel, the trial court took the matter under advisement. The parties were allowed to file post-trial memoranda. The trial court found in favor of the defendants and dismissed the Curoles' claims. The trial court gave reasons for ruling, which state in pertinent part:

> At the trial, plaintiff's [sic] were proceeding under a conspiracy theory, however, defendant's [sic] alleged that the petition filed by plaintiff's [sic] failed to allege conspiracy with particularity. Clearly, the plaintiff[s] set forth material facts in the original Petition for Damages and the Supplemental filings. However, the heightened standard of 'conspiracy' is at issue here.
>
> In this case, there is no dispute that all of the defendant's [sic] arrived at the Curole's [sic] residence in the early morning hours and an attack was committed upon Mr. Curole. At trial, there was testimony that the plaintiff's [sic] were awakened to find four individuals in their bedroom (Bonnie Delcambre, Rory Delcambre, Quin [sic] Waguespack Delcambre, and Glen [sic] Gadrow). It was further adduced that Ms. Charlene Curole was able to identify each of those individuals in the bedroom, however, she was unable to identify those who actually struck her husband. Accordingly, Mr. Curole was also unable to identify the attackers. Testimony was also lacking as to

6

the 'conspiracy' theory to the events leading up to the attack in the Curole home.

In *Ross v. Conoco*, [02-299 (La. 10/15/02), 828 So.2d 546], the Supreme Court discussed the issue of pleading conspiracy, stating that the court of appeal began by noting that when a civil conspiracy is alleged and proven, the injured party may recover against all participants in solido, and not merely against those who physically committed the injury. The Court further explained that the civil conspiracy must be *sufficiently* alleged, indicating that while conspiracy may not need to be pled specifically, the petitioner must allege it in some way in the pleadings.

In the instant case, the petitioner's [sic] did not specifically allege conspiracy. Furthermore the plaintiff[s] did not nor was it proven that the defendant's [sic] intent was to cause harm to Mr. Curole. The petitioner's [sic] were only able to place the defendant's [sic] inside the house. Therefore, this Court finds in favor of the remaining defendant's [sic], dismissing petitioner's [sic] claims.

The Curoles timely appealed the trial court's judgment in favor of the defendants, asserting the following assignments of error:

1. The trial court committed reversible error and abused its discretion by ruling that the plaintiffs were required to plead conspiracy with particularity and disallowed testimony related to the actual conspiracy.

2. The trial court committed reversible error and abused its discretion in finding that there was no conspiracy because the plaintiffs did not prove that the defendants' intent was to cause harm to Mr. Curole.

## ANALYSIS

In their first assignment of error, the Curoles maintain the trial court committed reversible error and abused its discretion by ruling that the plaintiffs were required to plead conspiracy with particularity and disallowing testimony related to the actual conspiracy.

A review of the trial court's reasons for ruling indicate some confusion on its part. Relying on *Ross v. Conoco*, 02-299 (La. 10/15/02), 828 So.2d 546, and noting language in that case declaring while a conspiracy "[need not] be pled specifically," a plaintiff "must allege it in some way in the pleadings," the trial

court dismissed the Curoles' claims finding they failed to "specifically" plead conspiracy. We find the Curoles' pleadings sufficiently complied with the pleading requirements contained in the Louisiana Code of Civil Procedure, and find the trial court erred as a matter of law in holding there existed some heightened pleading formality requiring them to recite the word "conspiracy."

Initially, we find the trial court's reliance on *Ross* was misplaced. As the Curoles note, the *Ross* case involved litigation by the plaintiffs seeking punitive damages under La.Civ.Code art. 2315.3 for the defendants alleged storage, handling and transportation of vinyl chloride in a wanton or reckless manner. The *Ross* court stated:

> . . . [P]laintiffs have failed to show to this court how conspiracy to commit battery and to misrepresent fraudulently the harmful effects of vinyl chloride amount to a conspiracy to store, handle, or transport in a wanton or reckless manner the vinyl chloride that injured Ross and Landon. Even if plaintiffs did sufficiently allege a conspiracy to store, handle, or transport wantonly or recklessly the offending vinyl chloride, we find that former Article 2315.3 does not support the imposition of punitive damages against parties based solely on the physical acts of their co-conspirators.
>
> Although Article 2324 provides for solidary liability among co-conspirators for the damage caused by a willful or intentional act, the court of appeal in this case correctly held that a court cannot assign liability for *punitive damages* among co-conspirators *in solido. Ross v. Conoco, Inc.*, 2000-1757, p. 15 (La.App. 3d Cir.12/26/01), 805 So.2d 352, 365. The purpose of solidary liability is to compel any tortfeasor to pay an entire judgment. *See* La. Civ.Code art. 2324(A). The purposes of punitive damages, on the other hand, are to punish defendants and deter similar conduct. *James v. Formosa Plastics Corp.*, 95-1794, p. 4 (La.App. 1st Cir.4/4/96), 672 So.2d 319, 322, *writ denied*, 96-1091 (La.11/22/96), 683 So.2d 285. The *James* court found that punitive damages cannot be assessed against co-defendants in solido because, to accomplish their purpose of punishment and deterrence, punitive damages are assessed against an individual defendant based on his individual culpability, not on the acts of others. *James*, 672 So.2d at 322. We agree with the First Circuit's analysis in *James*.
>
> Additionally, the language of Article 2324 that co-conspirators are answerable in solido "for the damage caused by such act" indicates that the Article imposes solidary liability only for compensatory damages. . . It is compensatory damages that recompense a plaintiff for injury caused by a defendant's act.

8

> Punitive damages, on the other hand, are not *caused* by a defendant's act and are not designed to make an injured party "whole." Rather, they are meant to punish the tortfeasor and deter specific conduct to protect the public interest. *Billiot* [*v. B.P. Oil Co.*, 93-1118, p. 11 (La.9/29/94), 645 So.2d 604, 612]. Consequently, we conclude that the solidarity imposed by Article 2324 cannot be used to assess punitive damages against a party based on the acts of co-conspirators. To be subject to punitive damages, each co-conspirator's individual conduct must fall within the scope of the applicable penal statute.

*Id.* at 552-53.

*Ross* held that the solidary liability cannot be imposed to assess punitive damages against a party based on the acts of co-conspirators. To be subject to punitive damages, each co-conspirator's individual conduct must fall within the scope of the applicable penal statute. In the present case, the Curoles are not seeking punitive damages, but are only seeking compensatory damages for the actions of those defendants who were engaged together in overt acts which caused the damages to them.

Louisiana is a fact pleading state under the Louisiana Code of Civil Procedure. *Springer v. Nannie O'Neal Apartments*, 13-570 (La.App. 3 Cir. 11/13/13), 125 So.3d 606. Although it has always been necessary to state a cause of action and to allege the material facts constituting a cause of action, it is not necessary to allege all the evidence or legal theories supporting the basis for recovery. *Id.* Louisiana Code of Civil Procedure Article 854 provides:

> No technical forms of pleading are required.
>
> All allegations of fact of the petition, exceptions, or answer shall be simple, concise, and direct, and shall be set forth in numbered paragraphs. As far as practicable, the contents of each paragraph shall be limited to a single set of circumstances.

As the Curoles note, our Code of Civil Procedure only requires allegations with particularity in circumstances "constituting fraud or mistake." La.Code Civ.P. art. 856. The trial court's reference to a "heightened standard of 'conspiracy'" has no support in Louisiana's statutory or jurisprudential law.

9

The Curoles were only required under the Louisiana Code of Civil Procedure to put forth the material facts upon which the cause of action is based. This was clearly stated by the Louisiana Supreme Court in *Greemon v. City of Bossier City*, 10-2828, 11-39 (La. 7/1/11), 65 So.3d 1263. In that case, the court explained Louisiana's fact pleading system:

> Louisiana's Code of Civil Procedure uses a system of pleading based upon the narration of factual allegations. See *Montalvo v. Sondes*, 93-2813, p. 6 (La.5/23/94), 637 So.2d 127, 131. As described in [La.Code Civ.P.] art. 854: "No technical forms of pleading are required. All allegations of fact of the petition, exceptions, or answer shall be simple, concise, and direct, and shall be set forth in numbered paragraphs." The fact-pleading requirement replaces an earlier "theory of the case" pleading requirement. See [La.Code Civ.P.] art. 862, Official Revision Comments--1960, cmt. (b). Because the "theory of the case" pleading requirement has been abolished, "[s]o long as the facts constituting the claim or defense are alleged or proved, the party may be granted any relief to which he is entitled under the fact-pleadings and evidence." *Cox v. W.M. Heroman & Co., Inc.*, 298 So.2d 848, 855 (La.1974), overruled on other grounds by *A. Copeland Enterprises, Inc. v. Slidell Memorial Hosp.*, 94-2011, p. 9 (La.6/30/95), 657 So.2d 1292, 1299. However, even though the "theory of the case" need no longer be pled, [La.Code Civ. P.] art. 891 provides that a petition "shall contain a short, clear, and concise statement of all causes of action arising out of, and of the **material facts** of, the transaction or occurrence that is the subject matter of the litigation." (Emphasis added.)

*Id.* at 1268.

A review of the Curoles' amended petition shows it complied with the fact-pleading requirement of La.Code Civ.P. art. 854, setting forth the actions, omissions, and delictual conduct of all the named defendants:

4.
While petitioners were sound asleep in their home on the date and the time aforesaid, defendants, Rory Delcambre, Bonnie Delcambre, Tricia Menard, Quinn Delcambre, Lori Toups, Rayford Champagne and Glenn Gadrow, broke down the front door of the petitioners home and thereafter engaged in a savage and brutal attack upon petitioners while they lay sleeping helplessly in their bed.

5.
Petitioners awoke to the animalistic beatings being viciously administered by the defendants with fists and a pistol and utterly and completely without regard to the safety and well-being of petitioners

and to the contrary, with the intent and effect of causing severe bodily injury to petitioners.

7.

Petitioners show that the incident and the resulting injuries and damages were caused solely by reason of the fault, negligence, actions and omissions of duty on the part of defendants.

8.

Petitioner, Everett A. Curole, Jr., alleges that the fault, negligence, actions and omissions of duty of the defendants, Rory Delcambre, Bonnie Delcambre, Tricia Menard, Quinn Delcambre, Lori Toups, Rayford Champagne and Glenn Gadrow, produced, as a cause in fact, the following physical injuries sustained by petitioner, Everett A. Curole, Jr.:

. . . .

11.

Petitioner, Charlene Curole, alleges that the fault, negligence, actions and omissions of duty on the part of the defendants, Rory Delcambre, Bonnie Delcambre, Tricia Menard, Quinn Delcambre, Lori Toups, Rayford Champagne and Glenn Gadrow, produced, as a cause in fact, the following physical injuries sustained by petitioner, Charlene Curole:

. . . .

15.

As a direct result of the delictual conduct of defendants, Rory Delcambre, Bonnie Delcambre, Tricia Menard, Quinn Delcambre, Lori Toups, Rayford Champagne and Glenn Gadrow, petitioners, Everett A. Curole, Jr. and Charlene Curole, sustained property damage to their home, including a broken front door and door frame, as well as the breakage, vandalization and ruin of various personal and household effects and as a result, petitioners, Everett A. Curole, Jr. and Charlene Curole, are entitled to reasonable compensation for all damages reasonable in the premises.

The pleadings allege that the defendants entered the Curoles' residence together "with the intent and effect of causing severe bodily injury to petitioners." The evidence and testimony at trial corroborated that allegation. There was a previous ruling by the trial court in the confirmation of default judgment, albeit by a different trial judge, that Glenn Gadrow and Rayford Champagne "were acting in concert with each and the other named defendants to commit intentional and

willful acts" against the Curoles. We find the Curoles' petition sufficiently alleges a conspiracy on the part of the named defendants.

The record establishes the trial court, mid-trial while counsel for the Curoles was questioning Bonnie Delcambre, sustained the defendant's objection to any further questioning of her and any other witnesses regarding the alleged conspiracy between the defendants. The trial court's ruling was based on the erroneous conclusion that the Curoles failed to plead conspiracy with particularity. This error hampered the Curoles' ability to present additional evidence on the elements of conspiracy. However, we find even absent this evidence the record, as will be set forth, clearly establishes a conspiracy existed between the defendants in this case.

The Curoles also assert the trial court committed reversible error in finding there was no conspiracy because the Curoles failed to prove the defendants' *intent* was to harm Mr. Curole. The Curoles maintain the appropriate inquiry is whether there was a tort perpetrated through the instrumentality of a conspiracy.

Louisiana Civil Code Article 2324(A) provides:

> He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.

Defendants note the article was amended in 1987 to delete the language "assists or encourages" and was replaced by the specific use of the word "conspires."[3] Defendants maintain "assistance or encouragement can exist without a conspiracy." Regardless, the law maintains for a conspiracy to exist, it must be shown "an agreement existed to commit an illegal or tortious act, which act was actually committed, which resulted in the plaintiff's injury, and there was an agreement as to the intended outcome or result." *Owens v. Byerly*, 09-262

---

[3] Prior to 1987, La.Civ.Code art. 2324 read, in pertinent part, as follows:

He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.

(La.App. 3 Cir. 10/7/09), 23 So.3d 393, 398, *writ denied*, 10-117 (La. 4/16/10), 31 So.3d 1063, (quoting *Crutcher-Tufts Res., Inc. v. Tufts*, 07-1566, pp. 3-4 (La.App. 4 Cir. 9/17/08), 992 So.2d 1091, 1094). Louisiana Civil Code Article 2324(A) requires a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing. Evidence of such a conspiracy can be actual knowledge of both parties or ***overt actions with another***, or ***can be inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator***. *Boudreaux v. Jeff*, 03-1932 (La.App. 1 Cir. 9/17/04), 884 So.2d 665; *Stephens v. Ball Enforcement of Louisiana*, 96-809 (La.App. 1 Cir. 2/14/97), 690 So.2d 124, *writ denied*, 97-585 (La. 4/18/97), 692 So.2d 454.

This court in *Miller v. Keating*, 339 So.2d 40, 43 (La.App. 3 Cir. 1976), *writ granted*, 341 So.2d 901 (La.), *affirmed and amended*, 349 So.2d 265 (La.1977), noted:

> If a conspiracy is conceived and executed and a private injury results, the person injured has a cause of action against *all of the conspirators*. The action is for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged in the performance of those acts. *Tabb v. Norred*, [277 So.2d 223 (La.App. 3 Cir.), *writ denied*, 279 So.2d 694 (La.1973)] and cases cited therein.

(Emphasis added).

A conspiracy is also defined in Black's Law Dictionary as a "combination or confederacy between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful . . . act." The court in *Economy Carpets Manufacturers and Distributors, Inc. v. Better Business Bureau of Baton Rouge, Inc.*, 333 So.2d 765, 768 (La.App. 1 Cir.), *writ denied*, 334 So.2d 428 (La.1976), noted "[i]n Louisiana, if a conspiracy to do an unlawful act is entered into by two or more persons, and one of them does an act in furtherance thereof, all of the conspirators may be held civilly liable for damages to a third party resulting

13

therefrom. Article 2324, Civil Code, supra; *Tabb v. Norred*, 277 So.2d 223 (La.App. 3 Cir. 1973)."

In *Miller*, 339 So.2d 40, the defendant in that case did not directly participate in the beating of the plaintiff, but merely waited in the vehicle while it occurred. That defendant appealed his conviction as a co-conspirator, arguing since he did not actually participate in the battery and he did not intend to harm the plaintiff, he was not liable in damages. This court held:

> We find that Guillet at least tacitly entered into a conspiracy with Keating and Howren to injure plaintiff, that thereafter he assisted them in committing a battery on Miller pursuant to that conspiracy, and that the latter sustained severe injuries as a result of that battery.

> We conclude, therefore, that defendant Guillet assisted or encouraged in the commission of the battery on plaintiff Miller, and that he is answerable, in solido, with the other defendants for the damage caused by that act.

*Id.* at 43.

In *Tabb*, 277 So.2d 223, a police officer responded to a call of glass breaking at a neighborhood school and lights on at the school. The officer went in the school to investigate and located the defendant, Vincent, who was armed with a pistol. The officer was then shot by the co-defendant, Norred, who was also armed. This court, in affirming the trial court's determination of liability on the part of Vincent, noted that Vincent "entered into a conspiracy with Norred to commit an unlawful act, and he actively participated in committing that offense." *Id*. at 228. We further noted the parties foresaw the possible consequence of shooting someone to avoid apprehension, which constituted a part of the conspiracy. We concluded that Vincent, as a co-conspirator, was liable with Norred for the officer's injuries, even though Norred actually fired the shot.

In a prior case with similar facts, the Louisiana Supreme Court reached a comparable ruling in *Rush v. Town of Farmerville*, 156 La. 857, 101 So. 243 (1924). In that case, the plaintiff's son was killed by a shot fired by one member of

14

a mob of twenty or more persons. She instituted a suit for damages against several members of the mob. The court found that a conspiracy had been entered into by members of the mob and held that all of those who had participated in the conspiracy were liable, in solido, for the damages sustained by plaintiff, although only one of them had actually fired the shot. The court said:

> A "conspiracy" is a combination of two or more persons to do something unlawful, either as a means or as an ultimate end. *State v. Slutz*, 106 La. 182, 30 So. 298.
>
> The conspiracy having been sufficiently established, the act done by one in furtherance of the unlawful design is, in law, the act of all. *State v. Griffin*, 48 La.Ann. 1409, 20 So. 905. When a tort is perpetrated through the instrumentality of a combination or conspiracy, the party wronged and injured may look beyond the actual participants in committing the injury, and join with them, as defendants, all who co-operated in, advised, or assisted in the accomplishment of the common design, for co-trespassers are bound in solido.

*Id.* at 247.

Under the jurisprudence, it was only necessary for the Curoles to prove that the defendants, at a minimum, tacitly entered into a conspiracy for them to be liable, in solido, for the damages which occurred as a result of that act. After a thorough examination, we find the record sufficiently establishes the elements of a conspiracy.

As noted previously, the Curoles were at the Café Museum bar in Erath, when they encountered Lori Toups and her companion, Glenn Gadrow. Lori recounted that Charlene Curole made some negative comments to her about Bonnie Delcambre. Lori testified Charlene told her "she hated [Bonnie], she couldn't stand her, and she was going to go and find her and beat the crap out of her and kill her."[4] At approximately 1:00 a.m. the Curoles left Café Museum and returned to their home in Erath, where they went to bed.

_____

[4] We note Lori's account at the 2015 trial of what prompted her visit to Café Museum and what transpired after she arrived, differed significantly from her deposition testimony in 2009. When asked in her deposition whether Bonnie Delcambre accurately testified she was told that night by her that Mrs. Curole "wanted to kill her,"

15

Bonnie Delcambre testified she received a call from Lori Toups when she was still at a Christmas party in New Iberia. Bonnie recalled Lori told her Mrs. Curole was "saying bad things about me," and that "Mrs. Curole said she wanted to come find me and beat me up and wanted to kill me." Bonnie stated Lori called her several times while she was at the Christmas party. During the last call, Bonnie testified Lori stated "she was worried about me" and Bonnie told her they were going to the Dock Bar after the party.

According to Bonnie, when Lori walked into the Dock, she came over to her and said that she "was very worried because they were wanting to kill me or come beat me up." Bonnie testified what Lori told her made her "very mad." She then testified that "I just know that after her and [my] conversation, I left to meet Mrs. Curole – I was leaving to go meet Mrs. Curole."

During her 2007 deposition testimony, Bonnie said the following when asked about her encounters with Lori and the raging anger she felt:

> A.    She called me probably three or four times. By that time, I was fuming. She was coming to find me at the Christmas party, Mrs. Curole was. She was coming to beat me up…..after we left Rory's Christmas party, I went to that Delcambre bar again and met some friends and Ms. Toups and Mr. Glenn came to that bar. Well, Ms. Toups came up to me laughing and saying, you know, she's coming to beat you and she wants to kill you and on and on and on. Me and Mrs. Curole never really had any words except we talked on the phone once and she said to me that she was sorry for calling my daughter a bitch 'cause I had called her. I believe I had called her and asked her what was going on and she apologized and that afternoon, they came drop off Joey to meet us at the camp—at the landing and her and my daughter exchanged apologies and, you know I really never had anything with Mrs. Curole except for doing that to my kids.
>
> * * *
>
> Q.    You think it would have gotten to the level it did that night had [Lori] not been-
>
> A.  No, 'cause I'm not that kind of person.

<hr>

Lori replied "I don't recall that." She recalled only that Mrs. Curole said "next time she sees Bonnie on the street, she's going to kick her ass." Lori also insisted in her deposition she never called Bonnie while in the Museum Café, which is contrary to her trial testimony and the testimony of Bonnie Delcambre.

Q. What I was asking, you think [Lori's] the one that pushed you over the edge to make you want to go over there?

A. Yeah, I mean, if she wouldn't have called me, I wouldn't have known and I wouldn't have went.

Q. And not only did she call you several times, but when you met up with her at the café or the bar, she continued.

A. Uh-huh.

After talking with Lori and becoming enraged, Bonnie testified she became intent on finding and confronting Mrs. Curole over the alleged comments made to Lori. She quickly left the bar and proceeded to her vehicle. She then got in her vehicle, accompanied by Rory Delcambre, Trisha Menard and Rayford Champagne. Lori Toups and Glenn Gadrow followed in another vehicle, and Quinn Delcambre also followed in his vehicle.

In search of Mrs. Curole, they first stopped at Café Museum, where Lori Toups had previously encountered the Curoles. Upon determining the Curoles were not there, the group then proceeded to another bar, The Oaks. Upon finding the Curoles were not here, Bonnie decided to go to the Curoles' residence to confront Mrs. Curole. The three vehicles then proceeded to the Curoles' residence.

While Mr. and Mrs. Curole were sound asleep in their bed, the three vehicles arrived at the Curoles' residence. The accounts of what motivated each to do so during the early morning hours have changed over the years, as have their stories of "who did what" inside the Curoles' home after Bonnie "broke the door down." One thing is certain though: Mr. Curole was brutally attacked and suffered severe injuries by the time these intruders fled the scene.

Mr. Curole said he was awakened by the voice of Bonnie Delcambre. When he opened his eyes he saw Bonnie, Rory, Quinn, and Gadrow. He saw Rayford Champagne standing by the bedroom door. He recalled them saying they were going to teach him not to mess with any of the Delcambres in town, and they were

17

going to teach him a lesson he would never forget. He testified Quinn "held [his] wife down," and he was brutally beaten by several men.

Mrs. Curole testified she was awoken between 3:00-4:00 a.m. on December 21, 2002 when she heard people in her bedroom. She described the scene as follows:

Q. Okay. Can you identify who was in your bedroom when y'all were awakened?

A. We were awakened. There was Bonnie Delcambre, Rory Delcambre, Quincy Waguespack, and his name is Glenn Gadrow, Garrow, whatever.

. . . .

Q. And do you recall anyone else—do you recall seeing Mr. Rayford Champagne?

A. They had Rayford Champagne. They had Trish Broussard and Lori Toups. They were all in my doorway of the bedroom.

Q. Do you know how they got into your home?

A. They kicked the front door opened.

Q. And when you woke up and these people were in your doorway to your bedroom, what was the next thing that happened that you recall?

A. Well, they were holding me down, and they started beating up— well, I woke up and I asked what they were doing in my house. And Mr. Delcambre said that he came to teach us a lesson.

Q. And after that, what's the next thing you recall happening?

A. Well, they started beating up on Everette. They were holding me down.

Q. Who was holding you down?

A. Bonnie and Quint.

Q. Quinn?

A. Yes.

Q. Okay. And then, were you being hit at that time?

18

A.  Yes, sir.   Bonnie kept slapping me around.  Finally, I broke loose, and that's when I broke loose.  I took off running to my living room, then Quint jumped, started helping hit Everette.

Q. Quinn started beating up on Everette?

A.  Yes.  He started helping them beat him up.

. . . .

Q. Did you actually see any one of them hitting your husband?

A.  Yes, sir. They were beating him up. And once I took off running in the front, I don't know who else jumped in there.

Q. Did you see Mr. Gadrow hitting your husband?

A. Yes, sir.

Q. Okay. And then, you were in your living room, you testified, with Bonnie Delcambre, and y'all were having an altercation fighting. What happened after that?

A. Well, that's how my living room got tore up with the tree, the chairs and everything. And I still don't know who punched the walls that—I got holes in the wall in my kitchen, too. I don't know which one that did it. I mean, they had Lori Toups there, Trish Broussard and Rayford Champagne. I really didn't know—my concern was I didn't know if my husband was alive or dead, because I just seen splashes of blood all over.

After reviewing the record and the accounts given by all, we find the evidence as a whole establishes the Curoles' nightmare, when awoken in the presence of intruders in their home, did not begin when Bonnie decided to "break the door down."   It started hours before when Lori Toups engaged the Curoles in "chit chat" at the Museum Café.  It is clear that Bonnie would not have searched for Mrs. Curole's whereabouts during the early morning hours of December 21, 2002 if Lori Toups had not called her repeatedly at the Christmas Party and visited her at the Dock Bar repeating what Mrs. Curole allegedly said at the Museum Café, including the threat to "kill her"—a threat Lori denied she heard Mrs. Curole make when her deposition testimony was taken before the trial.[5]   It is also a fact

---

[5]     The record established there was previously trouble between the Curole and Delcambre children at school, which caused Bonnie to call Mrs. Curole to address the situation.  So she decided to confront the problem by calling

19

that Glenn Gadrow did not know the Curoles or the location of their home and would not have entered it had he not been driven there by Lori in her vehicle. Lori observed when she last saw the Curoles, they appeared intoxicated and said, "I figured that's why [Mrs. Curole] went on and on, you know, that—because she had been drinking." Lori admitted she was drinking and taking Zoloft at the time, although she denied knowing about the warnings against consuming alcohol while taking this medication.

Although repeatedly denying she ever thought anything "physical was going to happen," Lori eventually admitted on cross examination that a physical confrontation was a distinct possibility. Despite testifying she tried to talk Bonnie out of going to the Curoles' residence, Lori continued in her own vehicle to follow Bonnie and entered the house after Bonnie kicked the door down. On cross examination, Lori admitted she knew it was a crime to enter the Curoles' home, though she stated she was not thinking at the time. She also acknowledged she knew it "wasn't something [she] was supposed to do."

On further cross examination and after changing her version of events multiple times, Lori finally admitted she did not wait outside the house as first claimed, but entered the home shortly after Bonnie. She testified she "stuck" her head inside the bedroom and noticed Mr. Curole with abrasions, naked, standing with a pillow in front of his "private parts" and Glenn rubbing his knuckles. Other than Glenn, she was the last intruder to leave the house. Bonnie testified she talked to no one after leaving the Dock Bar and could not recount a single time when Lori Toups approached her or engaged her in conversation urging her not to go to or leave the Curoles' home.

---

Mrs. Curole to discuss the matter. By all accounts, the conversation was not combative between the two ladies, eventually leading to an apology from Mrs. Curole and a commitment between the two ladies to address the situation with their children.

Although she attempted at trial to maintain the incredulous notion that her purpose in going to the Curoles' house at 3:30 a.m. was just to talk with Mrs. Curole, Bonnie eventually acknowledged:

Q. And if you go into somebody's house in the middle of the night, bad things can happen.

A. Yes, sir, I realize that.

Q. And not just for the victims who, in this case, were in the house, but for the offenders who go in.

A. Yes, sir.

Q. You do realize this could have gotten way out of hand?

A. Yes, sir, I do.

Q. And all because you decided to go into that front door, kick the front door down—

A. Yes, sir.

At trial, Rory Delcambre testified he remembered only that he sobered up enough to see his wife and Mrs. Curole "pinned" down on the living room floor. He admitted at his earlier deposition in 2003 saying "that [he] saw everybody go into the house—[he] was the last one to go in, but [he] saw everybody go into the house."

Tricia Champagne was asked at trial if she found it strange that her mother wanted to speak with Mrs. Curole at that time of the night, and responded, "no, I didn't." Tricia recalled remaining in the back seat of the sports utility vehicle (SUV) after arriving at the Curoles' home but admits she was told she got out of the SUV and "was outside by the steps." Tricia continued to deny that she entered the home despite the testimony that she did so. But on further cross examination, Tricia admitted she was not sure whether she and her fiancé entered the home that night or later accompanied her mother to eat at the food mart because she claimed she and her fiancé were "drunk."

21

Quinn Delcambre testified he did not know the Curoles or where they lived and did not know where his parents were headed that night. He said when he got to the Curoles "everybody was outside." He thought his mother had entered the homeso he ran in to see what was going on and to get her out because he was "protective." He found her in the bedroom and said to her, "we need to go." He stated he saw his mother talking to Mrs. Curole and after "some words were said," he said "would you please quit f---ing with the Delcambres?" On cross examination, Quinn was forced to backtrack and admit he did know it was the Curoles' house:

Q. So you didn't know the Curoles?

A. No I didn't.

Q. You didn't know this was their house?

A. No.

. . . .

Q. How did you know to make that statement—

A. Oh, wait. Wait up.

Q. –because of an issue with your brother—

A. I misunderstood you earlier. Listen, I knew of the house and where they lived, but I never been to them and I didn't know them like that because you travel down the North Road on a regular basis. You kind of learn where people live.

Q. And I get that.

A. Yeah.

Q. That's why I asked you specifically, if you knew this was the Curoles' home and you said "no."

A. That's correct. I did say that. But I'm taking my statement back, that when you—I did pass and I know where they lived at, but I didn't know at that time what was going on, you know.

Officer Chris Galvez of the VPSO was offered and accepted by the court as a "law enforcement" expert. Based on his investigation, Officer Galvez was asked

if, in his opinion, he concluded the defendants were acting in concert and he replied, "I did." Officer Galvez testified it was his belief that "choosing to get into vehicles and drive to the residence which was, I believe, planned, and then carry it out, make the illegal entry, and then commit a crime, I think that lends credence to the conspiracy." He also stated, "I don't believe that people are going to go to straighten things out at 4:00 in the morning without the intention of engaging in a fistic altercation. . . ."

On redirect examination by the plaintiffs' counsel, Officer Galvez was asked:

> Q. Is it fair to say that your opinion about the conspiracy and acting in concert with each other is based on the totality of your investigation?
>
> A. Yes, sir.
>
> Q. Based on not only the statements given by Mr. Gadrow, and Mr. Waguespack, Ms. Delcambre, and Ms. Toups, but also your communication with the Curoles?
>
> A. Yes, sir.
>
> . . . .
>
> Q. So your opinion is based on a conspiracy, based on everything that you investigated?
>
> A. The totality.

We conclude the trial court manifestly erred in finding the defendants' intent to cause harm to the Curoles was not proven. The law establishes a conspiracy may be proved by circumstantial evidence, *Hall v. Lilly*, 29,624 (La.App. 2 Cir. 6/18/97), 697 So.2d 676. Moreover, it does not require that the Curoles prove each defendant knew a battery would take place in order to be held liable. Common sense preponderates in finding Bonnie Delcambre was not entering the house to have a "warm and fuzzy" conversation with the occupants. As noted, the evidence established the defendants left one bar and traveled together in a caravan of three

23

vehicles in search of the Curoles. They went to two different bars before then proceeding to the Curoles' residence. Upon arriving at the residence all of the defendants participated in the unauthorized entry into the residence, and all were present during the assault and battery committed upon Everett Curole. It is sufficient that each of the defendants participated in the furtherance of the conspiracy to find Charlene Curole and break into the Curoles' home for the obvious purpose of confronting Charlene. While in the home, they all evidenced their intention to cause havoc by whatever means—some punched holes in the walls while others entered the bedroom to violently assault Mr. Curole. Quinn Delcambre's comment, "that's what you get for ****ing with the Delcambres!" clearly evidences the acts performed by the defendants was part of a plan to punish the Curoles for insulting Bonnie Delcambre. After the assault, the defendants quickly fled the home, leaving Mr. Curole severely injured. Then, in an act of utter indifference, went to enjoy a leisurely breakfast at a nearby diner. The defendants are liable for the natural consequences that flowed from the melee that occurred within the home, which was a direct consequence of the unauthorized entry into the residence perpetrated by all the defendants. The law is clear the actionable element in a claim under La.Civ.Code art. 2324(A) is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually committed in whole or in part. *Ross*, 828 So.2d 546. Clearly, it was foreseeable that a physical altercation could result as a consequence of the defendants' decision to illegally break into the Curoles' home in the middle of the night. Thus, any of the co-conspirators are liable for the injuries caused to the Curoles, even if they did not actually participate in the beating of Mr. Curole.

The Curoles assign error in the trial court's ruling midway through trial that prevented them from introducing further testimony, including prior deposition testimony, to establish a conspiracy existed between the defendants. We find this

ruling was erroneous. While the Curoles have requested we remand the case for submission of the improperly excluded "conspiracy" evidence, we have examined the record in its entirety, including the depositions, and find the evidence, as it stands, sufficiently establishes a conspiracy existed between the named defendants. Therefore, we find no reason to remand the case for introduction of any additional evidence.[6]

We also find the damages rendered previously in the default judgment against Glenn Gadrow and Rayford Champagne reasonable and supported by the evidence. As set forth earlier the damages were:

| | |
|---|---|
| Everett Curole, General Damages | $150,000.00 |
| Everett Curole, Special Damages | $ 54,413.67 |
| Charlene Curole, General Damages | $ 50,000.00 |
| Nicholas Curole, Loss of Consortium Damages | $ 25,000.00 |
| Jonathan Curole, Loss of Consortium Damages | $ 25,000.00 |

The Curoles presented the testimony of several physicians at trial as to the nature and extent of the injuries sustained as a result of the incident. The record established Mr. Curole suffered severe injuries as a result of the beating he received at the hands of the defendants. Mr. Curole sustained a broken nose, broken/cracked ribs, multiple lacerations to his face and head, and a laceration to his kidney. He was transported from the scene by ambulance to the emergency room of Abbeville General Hospital. He underwent a CT of his abdomen and pelvis and a MRI of his kidneys.

As a result of Mr. Curole's injuries, he suffered from blurred vision, chest pains, neck pain and back pain. He was treated by Dr. Ronald Lahasky, an internist, for his internal injuries, which included repeatedly passing blood in his urine. He was diagnosed with a laceration to his kidney and bladder. Due to the severity of this problem, he was referred to Dr. Haden LaFaye at the Houma Surgi-

---

[6] We pretermit a ruling whether the trial court clearly erred in failing to assign any liability to Bonnie Delcambre and Quinn Delcambre, even absent a finding that a conspiracy existed. Further, the other defendants entered the house and trashed it without the Curoles' consent or authorization. The trial court did not address whether these acts were tortious and sufficient to find them liable for the harm caused by each individually and independently.

Center. Dr. LaFaye inserted a rod into Mr. Curole's penis to try to determine why he consistently had blood in his urine. It was discovered that Mr. Curole had a hematuria, a blood clot in his penis, which required a cytoscopic surgical procedure on May 20, 2003 to correct.

During this time period, Mr. Curole was also being treated by Dr. Roland Miller at the Acadiana Bone & Joint Clinic as a result of the multiple fractures to his ribs and nose he sustained due to the beating he received. Along with examining the previously taken x-rays and MRI, Dr. Miller performed a bone scan on Mr. Curole. Dr. Miller determined Mr. Curole sustained a ruptured sternum and several cracked and broken ribs. Dr. Miller released Mr. Curole from work due to the severity of his injuries. It was over thirteen months after the injury before Dr. Miller released Mr. Curole to return to work. Thus, he also suffered significant lost wages during this time.

Mr. Curole testified even after his release to return to work, he endured significant neck and lower back pain. In 2005, he began to treat with Barczyk Chiropractic Clinic to cope with the pain he was experiencing. He treated consistently with Barczyk Chiropractic Clinic until March of 2006, approximately three and one-half years following the severe beating he sustained on the morning of December 21, 2002.

Dr. Miller, Dr. LaFaye and Dr. Ryan Vidrine (who treated Mr. Curole at Barczyk Chiropractic Clinic) testified that the injuries they treated Mr. Curole for were sustained from the incident in question. Defendants offered nothing to contradict that Mr. Curole's injuries and medical treatment were caused by the beating he endured on December 21, 2002.

Mr. Curole, at the time of the incident, was employed by Grand Isle Shipyard and worked offshore. Mr. Curole was deemed unable to work by Dr. Miller and was not released back to employment until January 27, 2004. This was

26

over thirteen months after he was assaulted. It was testified to by Mr. Curole, and corroborated by Dr. Miller, that he attempted to return to work during 2003 as a crane operator. He stated he endured the pain for as long as he could, for approximately two months, before having to quit. Mr. Curole testified he attempted to return to work, despite not having reached maximum medical improvement, because he was the lone support for his family and was concerned they could lose their home. Thus, we find the Curoles sufficiently established Mr. Curole suffered approximately eleven months in lost wages, i.e., the thirteen months he was released from employment by Dr. Miller, minus the approximate two months he worked during that time as a crane operator.

The Curoles submitted their income tax returns for the years 2001, 2002 and 2003 to document Mr. Curole's past earning history and establish his average monthly salary. Thus, we find the record before us supports the previous award of $54,413.67 in special damages, which includes Mr. Curole's lost wages and medical expenses for the injuries he sustained.

We find the amounts rendered by the trial court in its judgment fairly and adequately compensate the plaintiffs for the damages suffered at the hands of the defendants, and heretofore render those amounts.

### DECREE

For the foregoing reasons, the trial court's judgment dismissing the Curoles' action for failure to plead conspiracy with particularity is reversed. Finding the evidence presented at trial established a conspiracy among the named defendants, which resulted in the damages suffered by the plaintiffs, we find defendants Bonnie Delcambre, Rory Delcambre, Tricia Menard, Quinn Waguespack and Lori Toups solidarily liable for the damages which resulted from the actions that followed the unauthorized entry into the plaintiffs' residence. Special damages are awarded in the amount of $54,413.67. Everett Curole, Jr., is awarded $150,000.00

27

in general damages and Charlene Curole is awarded $50,000.00 in general damages. Nicholas and Jonathan Curole are each awarded $25,000.00 in damages for loss of consortium. All costs of this appeal are assessed against defendants-appellees.

**REVERSED AND RENDERED.**